IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 04–cv–02206–EWN–PAC

CHURCH COMMUNICATION NETWORK, INC.,

     Plaintiff,

v.

ECHOSTAR SATELLITE L.L.C.
f/k/a ECHOSTAR SATELLITE CORPORATION,

     Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

This is a breach of contract and misrepresentation case. Plaintiff Church Communication

Network, Inc., alleges that Defendant Echostar Satellite L.L.C.: (1) made intentional or reckless

misrepresentations about the nature and scope of the exclusivity provision in Defendant's contract

with Dominion Video Satellite ("Dominion"); (2) failed to disclose facts regarding the contract

between Defendant and Dominion; (3) negligently misrepresented the nature and scope of the

exclusivity provision between Defendant and Dominion; and (4) materially breached the contracts

between them because Defendant did not have the ability to perform under the agreements due to

its prior agreement with Dominion. This matter is before the court on: (1) "Defendant's Motion

For Summary Judgment," filed June 27, 2005; (2) "Plaintiff's Notice of Motion and Motion For

Summary Judgment on Echostar's Liability For Plaintiff's Cause of Action For Intentional Or Reckless Misrepresentation," filed June 27, 2005; and (3) "Defendant's Motion For Summary Judgment On Plaintiff's New Claims In the First Amended Complaint Based On The Parties' February 2000 Contract," filed August 5, 2005.  Jurisdiction is based on 28 U.S.C. § 1332 (2006), diversity of citizenship.

**FACTS**

*1.     Factual Background*

Plaintiff is a company that provides Christian programs to a nationwide network of subscriber churches.  (Pl.'s Notice of Mot. and Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation, Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation ¶ 1 [filed June 27, 2005] [hereinafter "Pl.'s Br."]; *admitted in relevant part at* Echostar's Resp. to: (1) Pl.'s Notice of Mot. and Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation, (2) Pl.'s Mem. of Points of Authority Attached Thereto, and (3) Pl.'s Separate Statement of Undisputed Facts, Resp. to Statement of Undisputed Material Facts ¶ 1 [filed July 20, 2005] [hereinafter "Def.'s Resp."].)  Defendant is a company that delivers direct broadcast satellite television products and services to customers worldwide through a fleet of nine satellites. (*Id.*, Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation ¶ 2; *admitted at*

Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 2.)  Defendant also operates

under the trade name "DISH Network."  (*Id.*)

Bill Dallas incorporated Plaintiff in 1998.  (*Id.*, Separate Statement of Undisputed Facts in

Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For

Intentional Or Reckless Misrepresentation ¶ 3; *admitted at* Def.'s Resp., Resp. to Statement of

Undisputed Material Facts ¶ 3.)  Dallas had the vision to provide live, interactive programming

directly to churches via direct broadcast satellite.  (*Id.*)  Dallas, Ed Carlstone, and Reid

Rutherford are Plaintiff's key executives and founding members.  (*Id.*, Separate Statement of

Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of

Action For Intentional Or Reckless Misrepresentation ¶¶ 3–5; *admitted at* Def.'s Resp., Resp. to

Statement of Undisputed Material Facts ¶¶ 3–5.)  Plaintiff's business is based on charging

subscriber churches for encrypted programs that are not available to the general public.  (*Id.*,

Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's

Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation ¶ 6; *admitted at*

Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 6.)

    *a.*    **Dominion/Defendant Agreement and Arbitration**

On July 18, 1996, Defendant entered into a contract with Dominion entitled "Direct

Broadcast Service Transponder Lease, Channel Use and Programming Agreement By and Among

Dominion[], [Defendant] Directstat Corporation, Direct Broadcasting Satellite Corporation,

Direct Broadcast Satellite Corporation, and Echosphere Corporation."  (Def.'s Mot. For Summ.

J., Def.'s Br. in Supp. of Mot. For Summ. J., Statement of Undisputed Material Facts ¶ 1 [filed

June 27, 2005] [hereinafter "Def.'s Br."], Ex. A–1 [Dominion/Defendant Agreement]; *admitted at*

Pl.'s Opp'n to Def.'s Mot. For Summ. J., Resp. to Statement of Undisputed Facts ¶ 1 [filed July

18, 2005] [hereinafter "Pl.'s Resp."].)  As part of this agreement, Dominion and Defendant agreed

that, subject to certain exceptions, Dominion would have the exclusive rights to broadcast

Christian programs, defined as "video programming which has, as its overriding focus, Christian

religious content, and which is only marketed to appeal the Christian theme and content."  (*Id.*,

Statement of Undisputed Material Facts ¶ 2; *admitted at* Pl.'s Resp., Resp. to Statement of

Undisputed Facts ¶ 2.)  The following rights were excluded from the exclusivity agreement:

> (a) educational programming;
> (b) any original programming offered by either of the parties;
> (c) religiously oriented business television programming (which shall mean
> programming where it is most logical to assume the primary market for the
> programming would be churches and church-affiliated organizations; or
> (d) programming which the other party, following reasonable notice, declines to
> carry (not to exceed, with respect to Dominion, the [fifteen] Broadcast Channel
> limitation in Section 8.2 above).

(*Id.*, Statement of Undisputed Material Facts ¶ 3, Ex. A–1 § 8.4 [Dominion/Defendant

Agreement]; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 3.)

On February 5, 2001, Dominion sent Defendant a notice of election of arbitration

concerning various provisions of the agreement between them.  (*Id.*, Ex. A–3 [Notice of Election

of Arbitration].)  Specifically, Dominion sought to arbitrate the exclusivity as to Christian

programming:

> [Defendant's] Business Services Division is currently selling . . . airtime to
> Christian organizations, that is in conflict with Dominion's Christian theme and
> content program exclusivity clause of the Agreement which states that Dominion
> programming shall be "mutually exclusive" with [Defendant's] programming

> except in very limited ways.  Accordingly, Dominion demands arbitration of this
> issue.

(*Id.*)  On December 12, 2001, a panel of arbitrators entered an interim arbitration award in favor

of Dominion.  (*Id.*, Ex. A–4 at 8 [12/12/01 Arbitration Award].)  Specifically, the arbitration

panel agreed with Dominion's interpretation of section 8.4(c) and held that "the exception [in

8.4(c)] relates to the content of the program . . . and allows sending of non Christian

programming to a Christian audience but does not allow sending of Christian programming to any

audience."  (*Id.*)

>    **b.    *Events Preceding The Parties' 2000 Contract***

Beginning in 1999, Dallas knew there was a "special relationship" between Defendant and

Dominion that could impact Defendant's ability to broadcast certain types of Plaintiff's programs.

(Def.'s Br. in Supp. of Summ. J. on Pl.'s New Claims in the First Am. Compl. Based on the

Parties' February 2000 Contract, Statement of Undisputed Material Facts ¶ 4 [filed August 5,

2005] [hereinafter "Def.'s 2d Br."]; *admitted at* Pl.'s Opp'n to Def.'s Mot. For Summ. J. on First

Am. Compl., Resp. to Def.'s Statement of Undisputed Facts ¶ 4 [filed August 29, 2005]

[hereinafter "Pl.'s 2d Resp."].)  Specifically, Dallas testified that:

> We might have — back in as early as 1999 probably . . . heard of the word
> 'exclusive' — I'm not sure again that was the word — but more importantly, that
> they had some type of special relationship which could have some bearing on
> [Defendant's] ability to do a certain type of broadcasting.  There was something
> going on between the two.  So we knew there was some type of something that
> was going on. . . . I knew that it could have some bearing on potentially how we
> worked with [Defendant], and so I don't know that I knew specifically what it
> was.  I just knew that it could have some bearing on how we did business with
> [Defendant] as our satellite platform.

(*Id.*, Ex. A–2 at 57–59 [Dep. of Bill Dallas].)  Prior to selecting Defendant and entering into the 2000 Contract, Carlstone knew Dominion and Defendant had "an arrangement" and that "some type of contractual agreement existed between Dominion and [Defendant]."  (*Id.*, Statement of Undisputed Material Facts ¶ 6; *admitted at* Pl.'s 2d Resp., Resp. to Def.'s Statement of Undisputed Facts ¶ 6.)

Plaintiff contends that at its request, Mike Allen of Global Access[1] contacted William Vanderpoel, Defendant's Vice President concerning Defendant's contract with Dominion.  (Pl.'s Br., Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation ¶ 20.)  On May 7, 1999, Vanderpoel wrote a letter to Allen describing Defendant's interpretation of Dominion's exclusive rights under the Dominion/Defendant agreement.  (Def.'s 2d Br., Ex. A–4 [5/7/99 Letter From Defendant to Mike Allen]; *admitted at* Pl.'s Br., Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation ¶ 15; Pl.'s Resp., Statement of Additional Disputed Facts ¶ 11.)  Specifically, the letter stated that:

---

[1]Global Access is an integrator that provides equipment, transmission, and management services.  (Pl.'s Br., Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation ¶ 16; *admitted in relevant part at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 16.)  Global Access acts as an agent on behalf of networks such as Plaintiff and purchases satellite time from satellite companies like Defendant.  (*Id.*)  Plaintiff eventually decided not to use Global Access as its integrator.  (*Id.*, Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation ¶ 17; *admitted in relevant part at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 17.)

> [i]n the agreement, 'Christian Programs' is defined as video programming with an overriding focus on Christian religious content specifically marketed to the home-based Christian population . . . the contract contains a carve out that allows [Defendant] to offer Christian based business television programming where it is most logical to assume the primary market for the content would be churches and church-affiliated organizations. . . . The other possibility would be in the event Dominion declined to carry the Christian programming.

(*Id.*, Ex. A–4 [5/7/99 Letter From Defendant to Mike Allen].)  The definition of "Christian Programs" in the Dominion/Defendant contract was not expressly limited to home-based markets as opposed to church-based markets, but this was Defendant's interpretation.  (Def.'s Br., Ex. A–1 §§ 8.1, 8.3, 8.4 [Dominion/Defendant Agreement]; Pl.'s Resp., Statement of Additional Disputed Facts ¶ 12.)

Beginning in 1999, Ed Giles began working on behalf of Plaintiff as a consultant and contractor "tasked with the selection and implementation of [Plaintiff's] satellite network." (Def.'s 2d Br., Statement of Undisputed Material Facts ¶ 9, Ex. A–5 [10/28/99 Letter From Ed Giles to Kathy Johnson of Dominion]; *admitted at* Pl.'s 2d Resp., Resp. to Def.'s Statement of Undisputed Facts ¶ 9.)  Prior to entering into the 2000 contract, Giles had one conversation with Kathy Johnson of Dominion wherein she informed Giles that "Dominion had the right to broadcast religious programming exclusively."  (*Id.*, Statement of Undisputed Material Facts ¶ 10; *admitted at* Pl.'s 2d Resp., Resp. to Def.'s Statement of Undisputed Facts ¶ 10.)

### c.    The Parties' 2000 Contract

The parties entered into a Business Television Agreement ("the 2000 Contract") on February 22, 2000.  (*Id.*, Statement of Undisputed Material Facts ¶ 11; *admitted at* Pl.'s 2d Resp., Resp. to Def.'s Statement of Undisputed Facts ¶ 11.)  The introduction to the 2000 Contract

states in relevant part that: "[Plaintiff] desires to produce and deliver educational television

("BTV") programming to certain persons, and desires that [Defendant] provide Transmission

Services, in accordance with and subject to the terms of this Agreement."  (*Id.*, Ex. A–7 §

Introduction B [2000 Contract].)  BTV programming is defined as "programming provided

[Defendant] by Integrator or Integrator's BTV clients pursuant to this Agreement."  (*Id.*, Ex. A–7

§ I Definitions ¶ 1.3 [2000 Contract].)  The 2000 Contract contemplated a three year term, which

would not automatically renew.  (*Id.*, Statement of Undisputed Material Facts ¶ 14; *admitted at*

Pl.'s 2d Resp., Resp. to Def.'s Statement of Undisputed Facts ¶ 14.)  Plaintiff contends that it

relied on Defendant's representations regarding the Dominion/Defendant agreement and built its

network and furnished its customers exclusively with equipment compatible with Defendant's

technology.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 16; *denied at* Def.'s Reply Br.

in Supp. of Summ. J. on Pl.'s New Claims in The First Am. Compl. Based on The Parties'

February 2000 Contract, Resp. Concerning Additional Disputed Facts ¶ 16 [filed Sept. 13, 2005]

[hereinafter "Def.'s 2d Reply"].)

Plaintiff's clientele grew and increased from 120 churches to almost 2000 churches in less

than five years.  (*Id.*, Statement of Additional Disputed Facts ¶ 17; *admitted at* Def.'s 2d Reply,

Resp. Concerning Additional Disputed Facts ¶ 17.)  Rutherford, Plaintiff's Chief Financial Officer,

cannot recall any individual program that Defendant refused to broadcast from February 2000

through January 2003.  (Def.'s 2d Br., Statement of Undisputed Material Facts ¶ 15; *admitted at*

Pl.'s 2d Resp., Resp. to Statement of Undisputed Material Facts ¶ 15.)  Similarly, Dallas cannot

recall Defendant rejecting any of Plaintiff's broadcasts during the term of the 2000 Contract.  (*Id.*,

Statement of Undisputed Material Facts ¶ 16; *admitted at* Pl.'s 2d Resp., Resp. to Def.'s Statement of Undisputed Facts ¶ 16.)  Specifically, Dallas testified: "as far as did they ever prevent us, stop us from broadcasting a program, to the best of my knowledge, the answer still remains, I do not believe they did." (*Id.*, Statement of Undisputed Material Facts ¶ 17; *admitted at* Pl.'s 2d Resp., Resp. to Def.'s Statement of Undisputed Facts ¶ 17.)

Dominion wrote several letters to Defendant when it discovered Defendant was broadcasting Plaintiff's Christian programming.  (Pl.'s Br., Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation ¶ 34; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 34.)  In February 2002, Dominion contacted Plaintiff and objected to Defendant's broadcast of Plaintiff's program.  (*Id.*, Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation ¶ 36; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 36.)  Defendant never showed the Dominion letters to Plaintiff or told Plaintiff that Dominion objected to Defendant's broadcast of Plaintiff's programming until February 2002.  (*Id.*, Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation ¶ 35; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 35.)

In early 2002, Dallas had two telephone conversations with Kathy Johnson of Dominion. (Def.'s Br., Statement of Undisputed Material Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to

Statement of Undisputed Facts ¶ 6.)  Johnson told Dallas that Dominion had the exclusive right to broadcast programs that were Christian based and that venue or market would not be an exception.  (*Id.*, Statement of Undisputed Material Facts ¶ 8; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 8.)  In March 2002, Dallas flew to Florida to meet with Johnson, Robert Johnson (former Chief Executive Officer of Dominion), and other Dominion representatives.  (*Id.*, Statement of Undisputed Material Facts ¶ 11; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 11.)  Dallas' purpose in meeting with Dominion was business development and "to get some clarification of what was going on" between Defendant and Dominion.  (*Id.*, Ex. A–5 at 108–09 [Dep. of Bill Dallas].)  Following this meeting, Johnson contacted Dallas and told him that Plaintiff's "A-Men" Program violated the Dominion/Defendant agreement.  (*Id.*, Ex. A–5 at 137–38 [Dep. of Bill Dallas].)

On April 5, 2002, Rutherford sent an electronic mail message to Dallas, other executives at Plaintiff's company, and Plaintiff's legal counsel summarizing a voicemail message from Johnson.  (*Id.*, Statement of Undisputed Material Facts ¶ 15, Ex. A–6 [4/5/02 Electronic Mail Message From Rutherford to Dallas, Carlstone, Dale Wallace, and Glenn Waddell]; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 15.)  Rutherford relayed that "there's a significant difference of what programming is [okay] or not.  Since [Defendant] doesn't believe we're in violation, we need to understand what [Dominion] thinks to do [sic]."  (*Id.*)  Also on April 5, 2002, Rutherford sent a different electronic mail message to Dallas, other executives at Plaintiff's company, and Plaintiff's legal counsel recapping the substance of a telephone conversation he previously had with Johnson.  (*Id.*, Statement of Undisputed Material Facts ¶ 16;

*admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 16.)  Rutherford reported that

Dominion believed "[Defendant] can carry: Pastor to Pastor [and] Pastor only training.  Anything

to a congregation (e.g. Marriage, men's conference, etc.) is a problem. [Plaintiff] should talk to

[Dominion] about such programming."  (*Id.*, Statement of Undisputed Material Facts ¶ 17,

[quoting Ex. A–6 (4/5/02 Electronic Mail Message From Rutherford to Dallas, Carlstone, Dale

Wallace, and Glenn Waddell)]; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶

17.)  Following Rutherford's April 2002 communication with Johnson, Rutherford concluded

that: "my judgment was that [Dominion's] litigation, which we knew was already happening

between [Defendant] and [Dominion] and the fact that she was so angry on these communications

with me by phone, voicemail, and indirectly, led me to believe that eventually, this would end up

in court."  (*Id.*, Ex. A–8 at 115–16 [Dep. of Reid Rutherford].)

On April 9, 2002, one of Plaintiff's attorneys, Dale Wallace, had a telephone conversation

with an attorney for Defendant regarding the contentious relationship between Dominion and

Defendant and the arbitration between those two entities.  (*Id.*, Statement of Undisputed Material

Facts ¶ 20; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 20.)  Defendant's

attorney gave Wallace information regarding the lawsuit between Dominion and Defendant,

including "the name, the style of the lawsuit, and the case number."  (*Id.*, Statement of

Undisputed Material Facts ¶ 21, Ex. A–10 at 28 [Dep. of Dale Wallace]; *admitted at* Pl.'s Resp.,

Resp. to Statement of Undisputed Facts ¶ 21.)  Following this conversation, Wallace sent an

electronic mail message to Plaintiff explaining that he had "a very productive conversation" with

Defendant's attorney and that Defendant's attorney gave him information on the pending lawsuit.

(*Id.*, Statement of Undisputed Material Facts ¶ 22; *admitted at* Pl.'s Resp., Resp. to Statement of

Undisputed Facts ¶ 22.)  Wallace told Plaintiff that he thought the "current issues seem to relate

to the interpretation of the arbitration award," and he would "secure all of the public records."

(*Id.*, Statement of Undisputed Material Facts ¶ 22, Ex. A–11 [4/9/02 Electronic Mail Message

From Dale Wallace to Reid Rutherford]; *admitted at* Pl.'s Resp., Resp. to Statement of

Undisputed Facts ¶ 22.)  Wallace asked his paralegal to perform an online search in an effort to

obtain some of the documents.  (*Id.*, Statement of Undisputed Material Facts ¶ 23; *admitted at*

Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 23.)  Wallace testified that he was not

aware of anyone from his office calling the courthouse to find out what was publicly available and

his paralegal did not recall making such telephone call.  (*Id.*, Ex. A–10 at 94 [Dep. of Dan

Wallace].)[2]

On April 23, 2002, representatives from Defendant's and Plaintiff's companies met in

Denver, Colorado.  (*Id.*, Statement of Undisputed Material Facts ¶ 31; *admitted at* Pl.'s Resp.,

Resp. to Statement of Undisputed Facts ¶ 31.)  From Plaintiff's perspective, the purpose of this

meeting was "to help [Plaintiff] understand the impact of the Dominion/Defendant arrangement

on Plaintiff's use of the [Defendant] system."  (*Id.*, Statement of Undisputed Material Facts ¶ 32;

*admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 32.)  At this meeting, Plaintiff

---

[2]On January 23, 2002, the division of the United States District Court for the District of
Colorado hearing the Dominion/Defendant matter denied Defendant's motion to file the
arbitration award under seal in that matter.  (Def.'s Br., Ex. A–14 [Docket Sheet].)  On January
23, 2002, Defendant filed the arbitration award which was Exhibit A to the "motion to file the
arbitration award under seal."  (*Id.*)  In the upper right hand corner of "Exhibit A" is a stamp
indicating "FILED United States District Court Denver, Colorado Jan. 23, 2002."  (*Id.*)

and Defendant discussed encryption as a possible exception to Dominion's exclusivity rights.  (*Id.*, Statement of Undisputed Material Facts ¶ 33; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 33.)

By November 2, 2002, Plaintiff knew Dominion was challenging Defendant's planned broadcasts of two of Plaintiff's programs, "The Great Debate" and "Beachfest."  (*Id.*, Statement of Undisputed Material Facts ¶ 35; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 35.)  Sometime in the Fall of 2002, Johnson contacted Plaintiff regarding Plaintiff's Beachfest program.  (Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 37.)  Dallas testified that after the call from Johnson, somebody either from his company or Defendant's company discussed the possible encryption exception to the exclusivity agreement to which Johnson replied "[e]ncryption does not matter."  (Def.'s Br., Ex. A–5 at 145 [Dep. of Bill Dallas].)

> ### d.      The Parties' 2003 Contract

Prior to entering into the 2003 Contract, Dallas had a conversation with Johnson, wherein Johnson told him that Dominion's position was that encryption was not an exception to exclusivity.  (*Id.*, Statement of Undisputed Material Facts ¶ 38; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 38.)  While negotiating the 2003 Contract, Plaintiff did not believe what Dominion said regarding the Dominion/Defendant agreement and instead chose to enter into the 2003 Contract with Defendant.  (Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 41.)  Plaintiff had the option of not entering into the 2003 Contract with Defendant:

> Q.      And if you had chosen not to enter into the second agreement with [Defendant], [Plaintiff] would have had to migrate to another network, is that correct?

> A.    If we'd not entered into a second contract, [sic] would have had to migrate to another network? Yes, we would have had to migrate to another network.

(Def.'s Br., Ex. A–5 at 347–48 [Dep. of Bill Dallas].)

When negotiating the 2003 Contract with Defendant, Plaintiff requested an escape clause "to allow [Plaintiff] out of a situation where [Defendant] wasn't able to broadcast." (*Id.*, Statement of Undisputed Material Facts ¶ 43; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 43.) Plaintiff contends that this clause was meant to cover situations where the satellite became permanently inoperable or the technology became unreliable, because of solar flares, sun spots, or other situations beyond Plaintiff's reasonable control. (*Id.*, Ex. A–8 at 145–46 [Dep. of Reid Rutherford].) On January 8, 2003, Plaintiff signed the 2003 Contract including the "escape clause." (*Id.*, Statement of Undisputed Material Facts ¶ 45; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 45.)

On April 15, 2004, a second arbitration panel unanimously ruled in favor of Dominion against Defendant, holding that:

> [t]he parties agree, and the Panel finds, that technical conditions, such as satellite location, full or partial CONUS or audience size, are not adequate or sufficient grounds for giving [Defendant] the right to carry Christian programming under Section 8.4(d). The right for [Defendant] to carry Christian programming under Section 8.4(d) stems only from a refusal by Dominion to carry the programming.

(Pl.'s Br., Ex. 28 [4/15/04 Arbitration Award].) In June 2004, Defendant informed Plaintiff that Defendant could no longer broadcast Plaintiff's Christian programs. (*Id.*, Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of

-14-

Action For Intentional Or Reckless Misrepresentation ¶ 45; *admitted in relevant part at* Def.'s

Resp., Resp. to Statement of Undisputed Material Facts ¶ 45.)

**2.      *Procedural History***

On August 26, 2004, Plaintiff filed its complaint in the Northern District of Alabama.

(Compl. [filed Aug. 26, 2004].)  Plaintiff asserted claims for: (1) breach of contract, (2) wanton

breach of contract, (3) negligent misrepresentation, (4) intentional or reckless misrepresentation,

and (5) non-disclosure.  (*Id.* ¶¶ 28–53.)  On October 25, 2004, the Northern District of Alabama

transferred the action to this court.  (Notice of Transfer [filed Oct. 25, 2004].)

On June 27, 2005, Defendant filed a motion for summary judgment.  (Def.'s Br.)

Defendant contends that it is entitled to summary judgment on Plaintiff's counts three, four, and

five because Plaintiff did not justifiably rely on Defendant's representations or omissions when it

entered into the 2003 Contract.  (*Id.* at 17–24.)  Next, Defendant contends it is entitled to

summary judgment on Plaintiff's non-disclosure claim because Defendant did not owe Plaintiff

any duty.  (*Id.* at 24–26.)  Additionally, Defendant contends that Plaintiff's claim for negligent

misrepresentation is barred by Colorado's economic loss rule.  (*Id.* at 26–27.)  Finally, Defendant

contends that Plaintiff's claim for breach of contract fails because of the force majeure provision

and Plaintiff's damages are capped at $500,000.  (*Id.* at 27–33.)  On July 18, 2005, Plaintiff filed a

response in opposition to Defendant's motion.  (Pl.'s Resp.)  On August 2, 2005, Defendant filed

a reply in support of its motion for summary judgment.  (Reply in Supp. of Def.'s Mot. For

Summ. J. [filed Aug. 2, 2005] [hereinafter "Def.'s Reply"].)

Similarly, on June 27, 2005, Plaintiff filed its motion for summary judgment on Plaintiff's claim for intentional or reckless misrepresentation.  (Pl.'s Br.)  Plaintiff argues that Defendant made "objectively and patently" false statements regarding the exclusivity agreement between Dominion and Defendant.  (*Id.* at 19.)  Plaintiff contends that these statements induced Plaintiff to enter into the 2000 and 2003 Contracts.  (*Id.* at 8.)  On July 20, 2005, Defendant filed a response in opposition to Plaintiff's motion for summary judgment on its intentional or reckless misrepresentation claim.  (Def.'s Resp.)  On August 8, 2005, Plaintiff filed a reply in support of its motion for summary judgment.  (Pl.'s Reply in Supp. of Mot. for Summ. J. On Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation [filed Aug. 8, 2005] [hereinafter "Pl.'s Reply"].)

On July 19, 2005, Plaintiff filed an amended complaint.  (First Am. Compl. [filed July 19, 2005] [hereinafter "Am. Compl."].)  Plaintiff asserted claims for: (1) intentional or reckless misrepresentation in entering into the 2000 and 2003 Contracts; (2) non-disclosure with respect to the 2000 and 2003 Contracts; (3) negligent misrepresentation with respect to the 2000 and 2003 Contracts; and (4) breach of contract with respect to both the 2000 and 2003 Contracts.  (*Id.* ¶¶ 40–70.)  On August 5, 2005, Defendant filed its answer to Plaintiff's amended complaint.  (Echostar's Answer to First Am. Compl. [filed Aug. 5, 2005].)

On August 5, 2005, Defendant filed a motion for summary judgment on Plaintiff's new claims in the first amended complaint.  (Def.'s 2d Br.)  Defendant argues that its first motion for summary judgment only addressed Plaintiff's claims arising from the parties' 2003 Contract.  (*Id.* at 1.)  Defendant argues that Plaintiff's first three claims for relief must fail because Plaintiff

cannot prove justifiable reliance. (*Id.*) Next, Defendant contends that Plaintiff's breach of contract claim fails because there was no breach of the 2000 Contract. (*Id.*) Finally, Defendant contends that all of Plaintiff's claims fail because Plaintiff suffered no damages for any of its claims under the 2000 Contract. (*Id.*) On August 29, 2005, Plaintiff filed a response in opposition to Defendant's second motion for summary judgment. (Pl.'s 2d Resp.) On September 13, 2005, Defendant filed a reply in support of its second motion for summary judgment. (Def.'s 2d Reply.)

## ANALYSIS

### 1.    *Standard of Review*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2003); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S.

at 324; *see* Fed. R. Civ. P. 56(e).  "'Only disputes over facts that might affect the outcome of the suit under governing law will preclude the entry of summary judgment.'"  *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  The factual record must be viewed in the light most favorable to the nonmoving party.  *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 [10th Cir. 1990].)

**2.      *Evaluation of Claims***

As stated above, Plaintiff asserts the following claims for relief against Defendant: (1) intentional or reckless misrepresentation in entering into the 2000 and 2003 Contracts (first claim); (2) non-disclosure in entering into the 2000 and 2003 Contracts (second claim); (3) negligent misrepresentation in entering into the 2000 and 2003 Contracts (third claim); and (4) breach of the 2000 and 2003 Contracts (fourth claim).  (Am. Compl. ¶¶ 40–70.)  Each of Plaintiff's claims relate to the 2000 and 2003 Contracts and must be analyzed separately with respect to each contract because the facts and circumstances regarding the contracts are different.  Below, I analyze Plaintiff's first three claims for relief (the "tort claims") with respect to each contract, followed by Plaintiff's breach of contract claims.

**a.      *Plaintiff's Tort Claims***

The elements of Plaintiff's three tort claims are somewhat overlapping.  Specifically, to sustain a claim for intentional or reckless misrepresentation, Plaintiff must demonstrate that: (1)

Defendant made a false representation of material fact; (2) Plaintiff relied on that misrepresentation; (3) Plaintiff had a right to rely on, or was justified in relying on the misrepresentation; and (4) the reliance resulted in damages.  *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1383 (Colo. 1994).  Similarly, to sustain a claim for fraudulent non-disclosure Plaintiff must demonstrate that: (1) Defendant concealed a material fact; (2) Defendant had a duty to disclose that fact; (3) Defendant concealed the fact with the intent that Plaintiff would take action; (4) Plaintiff acted in reliance on the concealment; (5) Plaintiff was justified in the reliance; and (6) Plaintiff suffered damages.  *Nielson v. Scott*, 53 P.3d 777, 779 (Colo. App. 2002).  Finally, to establish a claim of negligent misrepresentation, Plaintiff must demonstrate that "'[D]efendant supplied false information to [Plaintiff] in a business transaction, and failed to exercise reasonable care or competence in obtaining or communicating information on which other parties justifiably relied.'"  *Guardian Title Agency, L.L.C. v. Matrix Capital Bank*, 141 F. Supp. 2d 1277, 1283 (D. Colo. 2001) (quoting *Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, N.A.*, 892 P.2d 230, 236 [Colo. 1995]).  Common to each of these torts is the element of justifiable reliance on either the false representation or the assumption that the concealed fact does not exist.  For the reasons stated in more detail below, I find that Plaintiff cannot prove it justifiably relied on Defendant's representations or omissions in entering into either the 2000 or 2003 Contracts.  I evaluate Plaintiff's justifiable reliance with respect to each contract below.

### *(1)    2000 Contract*

Plaintiff contends that it entered into the 2000 Contract in reliance on meetings, writings, and conversations wherein Defendant's representatives misrepresented and failed to disclose

material facts relating to: (1) the language of the Dominion/Defendant agreement, (2) the nature

and scope of the exclusivity provision in the Dominion/Defendant agreement, (3) Defendant's

ability to broadcast Christian programs, and (4) Defendant's ability to perform the contract.  (Am.

Compl. ¶¶ 12–15, 41, 50, 59.)  Specifically, Plaintiff contends that Vanderpoel's May 1999 letter

did not accurately disclose the terms and scope of the exclusivity provisions contained in the

Dominion/Defendant agreement or Defendant's ability to broadcast Plaintiff's programs.  (Pl.'s

Br. at 17–22; Pl.'s 2d Resp. at 17–21.)  Defendant contends that Plaintiff cannot justify its

reliance on Vanderpoel's letter in light of the facts known to Plaintiff at the time.  (Def.'s 2d Br.

at 9.)

     Under Colorado law, reliance on a misrepresentation is unjustified if the context obviously

calls its accuracy into question or suggests that further investigation is necessary.  *Shoels v.

Klebold*, 375 F.3d 1054, 1069 (Colo. 2004).  "If the circumstances surrounding a transaction

would arouse a reasonable person's suspicion, then equity will not relieve a party from the

consequences of inattention and negligence in failing to pursue an investigation."  *Nielson*, 53

P.3d at 780.  Similarly, if the plaintiff is aware of conflicting representations sufficient to raise

substantial questions regarding the transaction, the plaintiff will not be justified in relying on the

defendant's statements.  *See Monte Verde v. Moore*, 539 P.2d 1362, 1365 (Colo. App. 1975).

     Here, Plaintiff was not justified in relying on Vanderpoel's May 1999 letter in entering into

the 2000 Contract given Plaintiff's knowledge of the conflicting statements made by Defendant

and Dominion regarding the exclusivity agreement.  Beginning in 1999, Plaintiff knew there was a

"special relationship" between Defendant and Dominion that could impact Defendant's ability to

do certain types of broadcasts.  (Def.'s 2d Br., Statement of Undisputed Material Facts ¶¶ 4–6;

*admitted at* Pl.'s 2d Resp., Resp. to Def.'s Statement of Undisputed Facts ¶¶ 4–6.)  Both Dallas

and Carlstone testified that they knew Dominion and Defendant had a contractual arrangement

that could effect how Plaintiff and Defendant worked together.  (*Id.*, Ex. A–2 at 57–59 [Dep. of

Bill Dallas], Ex. A–3 at 43 [Dep. of Ed Carlstone].)

In May 1999, Allen, on behalf of Plaintiff, contacted Vanderpoel regarding Defendant's

agreement with Dominion.  (Pl.'s Br., Separate Statement of Undisputed Facts in Supp. of Pl.'s

Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless

Misrepresentation ¶ 20.)  On May 7, 1999, Vanderpoel described Defendant's interpretation of

Dominion's exclusive rights under the Dominion/Defendant agreement to Allen.  (Def.'s 2d Br.,

Ex. A–4 [5/7/99 Letter From Defendant to Mike Allen].)  Vanderpoel told Allen that the

definition of "Christian Programming" in the Dominion/Defendant agreement included Christian

programming directed toward a certain market and that there were at least two possible

exclusions to Dominion's exclusivity rights.  (*Id.*, Ex. A–4 [5/7/99 Letter From Defendant to

Mike Allen].)  While Vanderpoel did not replicate the exact terms of the Dominion/Defendant

agreement in his letter to Allen, Vanderpoel summarized Defendant's interpretation of the terms

in the Dominion/Defendant agreement.  (Def.'s Resp., Resp. to Statement of Undisputed Material

Facts ¶ 22.)  Ultimately, Plaintiff did not hire Allen and instead hired Giles.

In October 1999, Johnson spoke with Giles and informed him that "Dominion had the

right to broadcast religious programming exclusively."  (Def.'s 2d Br., Statement of Undisputed

Material Facts ¶ 10; *admitted at* Pl.'s 2d Resp., Resp. to Def.'s Statement of Undisputed Facts ¶

10.)  This information directly contradicts Vanderpoel's May 1999 interpretation that there were

at least two possible exceptions to Dominion's exclusivity.  Despite this information, there is no

evidence that: (1) Plaintiff requested to review the Dominion/Defendant agreement at this point,

or (2) Plaintiff requested further information from Defendant.  Plaintiff cannot allege that it

justifiably relied on Vanderpoel's May 1999 statements when it received conflicting statements

five months later from Dominion.  Johnson's statement was enough to arouse Plaintiff's suspicion

regarding the rights of the parties.  *See id.* (buyers should have acted on information that showed

a need for further investigation); *see also Monte Verde*, 539 P.2d at 1365 (representations made

by seller of real estate were so conflicting that buyer was not justified on relying on these

statements).  Plaintiff should have acted on the information Giles and Allen obtained by

investigating the situation more thoroughly.  *See Nielson*, 53 P.3d at 780.  Moreover, Plaintiff is a

sophisticated company, represented by an agent and legal counsel.  Plaintiff cannot reasonably

claim it was misled.  For the reasons stated above, Plaintiff was not justified in relying on

Defendant's alleged misrepresentations when it entered into the 2000 Contract.

Plaintiff offers numerous arguments that counsel against this result.  First, Plaintiff alleges

that it was justified in relying on Vanderpoel's May 1999 letter because Vanderpoel misstated the

terms of the Dominion/Defendant agreement.  (Pl.'s Br. at 17.)  Specifically, Plaintiff contends

that Vanderpoel's letter stated that "'Christian Programs' is defined as video programming with

an overriding focus on Christian religious content specifically marketed to the home-based

Christian population.'"  (*Id.*)  Plaintiff asserts that "Vanderpoel knew first hand, having read the

Dominion[/Defendant] contract that . . . 'Christian Programs' are defined as '[v]ideo

programming which has, as its overriding focus, Christian religious content, and which is only

marketed to appeal to the Christian theme and content.'" (*Id.*)  Plaintiff contends that Defendant

misled Plaintiff by stating that Dominion did not have exclusivity over all Christian programs, but

only "Christian programs sent to the home market." (*Id.* at 17–18.)  Plaintiff's argument is

misplaced.  Even assuming Vanderpoel's statement was false,[3] this does not establish that Plaintiff

justifiably relied on the alleged false and misleading statement.  Plaintiff was not justified in relying

on this May 1999 letter when it subsequently received information from Dominion regarding

Dominion's belief that it had the exclusive rights to all religious programming and Plaintiff knew

Dominion and Defendant were contractually bound.

   Next, Plaintiff cites *Groves v. Chase*, 151 P. 913, 158 (Colo. 1915), for the proposition

that it is not a defense to a misrepresentation claim that Plaintiff had information from a third

---

[3]Plaintiff argues in its motion for summary judgment that Vanderpoel's letter contained "objectively verifiable misrepresentations," such that summary judgment is appropriate with respect to Plaintiff's claim (Pl.'s Br. at 17–22.)  As stated above, I will not discuss whether Vanderpoel's statements in the May 1999 letter constitute a fraudulent misrepresentation of a material fact, but I do pause to discuss this argument briefly.  At the time Vanderpoel wrote the May 1999 letter, there was a dispute ensuing between Dominion and Defendant.  Defendant believed that the carve out provision in the Dominion/Defendant agreement which excluded "religiously oriented business television programming (which shall mean programming where it is most logical to assume the primary market for the programming would be churches and church-affiliated organizations)" necessarily applied to Christian programming directed to churches and church-affiliated organizations.  (Def.'s Resp., Resp. to Statement of Undisputed Facts ¶ 22.)  Defendant's representations to Plaintiff in May 1999 reflected this belief.  Thus, it is not clear that Vanderpoel's statements were necessarily false or fraudulent based on the circumstances at the time.  The fact that an arbitration panel subsequently determined that Defendant's interpretation of the agreement was incorrect does not necessarily mean that Defendant intentionally misrepresented the facts to Plaintiff.  I do not need to further evaluate this argument with respect to the 2000 Contract because, as noted above, Plaintiff was not justified in relying on the May 1999 letter.

party.  (Pl.'s 2d Resp. at 17.)  In *Groves*, the parties entered into an agreement for the purchase of

a piece of property based on the defendant's representation that the land was good corn land and

worth one hundred dollars an acre.  *Id.* at 156–57.  Prior to the closing, the plaintiff inspected the

property and spoke with the current tenant.  *Id.* at 159.  The tenant told the plaintiff that the corn

yielded only twenty bushels to an acre.  *Id.* at 159.  When the plaintiff confronted the defendant

with this information, the defendant said that the low yield was because the corn was planted too

late.  *Id.*  Relying on the defendant's statements, the plaintiff entered into the contract for sale.  *Id.*

at 160–61.  The plaintiff later learned the land was poorly suited for farming and the defendant

was aware of this fact.  *Id.*  The court, relying on the fact that the parties did not have equal

means to the information, held that the defendant "cannot escape the legal consequence of his

fraudulent conduct by saying that the fraud might have been discovered had the party whom he

deceived exercised reasonable diligence and care."  *Id.* at 161–62.

     The instant case is not analogous to *Groves*.  Here, prior to entering into the 2000

Contract, Plaintiff knew Defendant and Dominion were involved in a contractual relationship and

Plaintiff knew that Dominion and Defendant had different interpretations of that agreement.

(Def.'s 2d Br., Statement of Undisputed Material Facts ¶¶ 4, 9; *admitted at* Pl.'s 2d Resp., Resp.

to Def.'s Statement of Undisputed Facts ¶¶ 4, 9.)  Additionally, Plaintiff did not produce any

evidence that it requested to view a copy of the Dominion/Defendant agreement up to that point.

Thus, Plaintiff cannot demonstrate that it did not have equal access to the information.  Moreover,

Plaintiff and Defendant are sophisticated companies, represented by agents and legal counsel.

Therefore, Plaintiff cannot now hide behind its ignorance and benefit from its failure to pursue an investigation.

Next, Plaintiff relies upon *Zang v. Adams*, 48 P. 509 (Colo. 1897), for the proposition that "a plaintiff may rely on the representations of high officials within a company, and is not charged with doubting their veracity." In *Zang*, the plaintiff relied on representations made by the president of a company regarding the value of land. *Id.* at 510–11. The defendant appealed the judgement in favor of the plaintiff and argued that the plaintiff should not have relied on the president's representations and should have examined the public records. *Id.* The court held that the plaintiff was justified in relying on the representation and the defendant should not have "an avenue of escape" simply because "the victim has been unsuspecting." *Id.* at 511. *Zang* is not analogous to the instant case. First, *Zang* involved an unsuspecting buyer of real estate as opposed to two sophisticated companies. Second, the plaintiff in *Zang* was "unsuspecting." In other words, the *Zang* plaintiff had no reason to doubt the president's representations. Here, Plaintiff knew of the contractual relationship between Dominion and Defendant and had information that Defendant's interpretation of the exclusivity provision in the Dominion/Defendant agreement was different than Dominions'. Thus, Plaintiff cannot claim it was "unsuspecting." For the reasons stated above, Plaintiff did not justifiably rely on any of Defendant's alleged misrepresentations when it entered into the 2000 Contract. Accordingly, Defendant is entitled to summary judgment on Plaintiff's tort claims with respect to the 2000 Contract.

### (2)   *2003 Contract*

Defendant contends that it is entitled to summary judgment on Plaintiff's tort claims with respect to the 2003 Contract because Plaintiff was not justified in relying on any alleged misrepresentations.  (Def.'s Br. at 17–24.)  Plaintiff contends that it was justified in relying on Defendant's alleged misrepresentations because: (1) Plaintiff may rely on the representations of high officials within a company, (Pl.'s Resp. at 36); (2) Plaintiff did not have an obligation to search the public domain, (*id.* at 36–37); (3) Colorado law does not require Plaintiff to make any further inquiries beyond Defendant's alleged misrepresentations, (*id.* at 37–38); and (4) the fact that Plaintiff's investigation did not reveal the truth did not matter because Defendant withheld the relevant documents.  (*Id.* at 41–43.)  Defendant, on the other hand, contends that "[P]laintiff knew the nature and extent of the risks, or should have known, and did not reasonably rely on any alleged misrepresentations or omission by [Defendant]."  (Def.'s Br. at 17.)

As stated above, reliance on a misrepresentation is unjustified if the context obviously calls its accuracy into question or suggests that further investigation is necessary.  *Shoels*, 375 F.3d at 1069.  Said another way, "'[w]hatever is notice enough to excite attention, and put the party upon his guard, and call for inquiry, is notice of everything to which such inquiry might have led.  When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it." *Cherrington v. Woods*, 290 P.2d 226, 228 (Colo. 1955).

Here, the overwhelming majority of evidence suggests that Plaintiff could not have justifiably relied on any representations Defendant might have made between the time the parties entered into the 2000 Contract through the signing of the 2003 Contract.  On December 12,

2001, a panel of arbitrators entered an interim arbitration award in favor of Dominion and against Defendant with respect to the exclusivity provision in the Dominion/Defendant agreement. (Def.'s Br., Ex. A–4 at 8 [12/12/01 Arbitration Award].)  Beginning in February 2002 through November 2002, Dominion and Plaintiff had numerous conversations regarding Dominion's belief that Defendant's conduct in broadcasting Plaintiff's programs violated the Dominion/Defendant agreement and the arbitration award.  (Pl.'s Br., Separate Statement of Undisputed Facts in Supp. of Pl.'s Mot. For Summ. J. On Echostar's Liability For Pl.'s Cause of Action For Intentional Or Reckless Misrepresentation ¶ 36; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Facts ¶ 36; Def.'s Br., Statement of Undisputed Material Facts ¶¶ 6, 11; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 6, 11.)  Specifically, Dominion informed Plaintiff that: (1) it "won" the arbitration; (2) it had the exclusive right to broadcast programs that were Christian-based; and (3) venue or market would not be an exception to the Dominion/Defendant agreement.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 6.)  Following these communications, Rutherford determined that the issues revolving around Defendant, Plaintiff, and Dominion "would end up in court."  (*Id.*, Ex. A–8 at 115–16 [Dep. of Reid Rutherford].)

Additionally, in April 2002, Plaintiff's attorney contacted Defendant's attorney to receive more information about the lawsuit between Defendant and Dominion and the resulting arbitration.  (*Id.*, Statement of Undisputed Material Facts ¶ 20; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 20.)  Defendant's attorney gave Plaintiff's attorney the name, style, and case number of the lawsuit.  (*Id.*, Statement of Undisputed Material Facts ¶ 21;

*admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 21.)  Based on the conversation

with Defendant's attorney, Plaintiff's attorney subsequently determined that the "current issues

seem to relate to the interpretation of the arbitration award" and he would "secure all the public

records." (*Id.*, Statement of Undisputed Material Facts ¶ 22, Ex. A–11 [4/9/02 Electronic Mail

Message From Dale Wallace to Reid Rutherford]; *admitted at* Pl.'s Resp., Resp. to Statement of

Undisputed Facts ¶ 22.)  Defendant filed the arbitration award in January 2002.  (*Id.*, Ex. A–14

[Docket Sheet Entry 37].)  Despite this fact, Plaintiff's attorney testified that he did not call the

courthouse to retrieve the award and was otherwise unable to review the award.  (*Id.*, Statement

of Undisputed Material Facts ¶ 22, Ex. A–10 at 94 [Dep. of Dan Wallace]; *admitted at* Pl.'s

Resp., Resp. to Statement of Undisputed Facts ¶ 22.)

Despite all of the forgoing information, Plaintiff still chose to enter into the 2003 Contract.

At a minimum, Plaintiff had a sufficient amount of notice regarding the conflict and  confusion

surrounding the exclusivity agreement between Dominion and Defendant that it should have

conducted a more thorough investigation.  Plaintiff knew of the arbitration between Dominion and

Defendant and Dominion's position that it prevailed in that arbitration.  Moreover, the arbitration

award was publicly available and Plaintiff's attorney allegedly searched that file and knew how to

find those documents.  *See Nielson*, 53 P.3d at 780 (recognizing that equity will not relieve a

party from the consequences of inattention and negligence in failing to pursue an investigation);

*see also M.D.C./Wood*, 866 P.2d at 1382 ("If the [plaintiffs] have access to information that was

equally available to both parties and would have led to the true facts, the [plaintiffs] have no right

to rely on the false representations."); *see also Cherrington*, 290 P.2d at 228 ("The presumption

is that, if the party affected by any fraudulent transaction . . . might, with ordinary care and attention, have seasonably detected it, he seasonably had actual knowledge of it."). Thus, Plaintiff could not have justifiably relied on any of Defendant's alleged misrepresentations.

Plaintiff offers numerous arguments that counsel against this result. First, Plaintiff contends that it may rely on the representations of high officials within a company and is not charged with doubting their veracity. (Pl.'s Resp. at 36.) In support of this proposition, Plaintiff cites *Zang*. (*Id.*) For the reasons stated in *Analysis*, § 2a(1), *supra*, this case is not analogous because Plaintiff is not "unsuspecting" in light of the fact that Dominion informed it on numerous occasions that Defendant's continued broadcast of Plaintiff's program was in violation of the Dominion/Defendant agreement. (*Id.*) Second, Plaintiff contends that it "was entitled to rely on [Defendant's] intentional misrepresentations as a matter of law, even if the information had been available in the public domain." (Pl.'s Resp. at 36.) In support of this proposition, Plaintiff cites *Pattridge v. Youmans*, 109 2d 646 (Colo. 1941). In *Pattridge*, the defendant sold the plaintiff a parcel of land. *Id.* at 647. It turned out the defendant did not own the land he sold the plaintiff, but instead, owned a different parcel. *Id.* The plaintiff sued and the court determined that the plaintiff had a right to rely on the defendant's misrepresentations despite the fact that the description and ownership of the land was a matter of public record. *Id.* at 648. In arriving at this conclusion, the court noted that the situation would be different if the plaintiff was advised to make his own investigation or had reason to believe that he should conduct his own investigation. *Id.* This case is not analogous to *Pattridge*.

Here, Defendant informed Plaintiff of the arbitration award and gave Plaintiff the name, style, and case number of the pending lawsuit between Dominion and Defendant.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 22; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 22.)  Additionally, Plaintiff's attorney conducted an investigation on behalf of Plaintiff, but testified that he was not aware of anyone from his office actually calling the courthouse to locate the arbitration award.  (*Id.*, Statement of Undisputed Material Facts ¶ 23, Ex. A–10 at 94 [Dep. of Dan Wallace]; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 23.)  Plaintiff's communication with Dominion should have prompted Plaintiff to conduct a more thorough investigation.  Plaintiff cannot recover simply because its own investigation was incomplete or ineffectual.  *See Cook v. Jackson Nat. Life Ins. Co.*, 844 F. Supp. 1410, 1413 (D. Colo. 1994) (plaintiff cannot recover where he did his own investigation and that investigation was incomplete or ineffectual); *M.D.C./Wood*, 866 P.2d at 1382 (citing 1 George F. Palmer, *Law of Restitution* § 3.19 at 350–51 [1978] [a party may not have the right to rely on a misrepresentation when "he could have learned the truth by reasonable inquiry"]).

Next, Plaintiff contends that "[t]he law of Colorado does not require [Plaintiff] to have made any further inquiries in order to justify its reliance on [Defendant's] misrepresentations." Plaintiff cites *Hayden v. Perry*, 134 P.2d 212 (Colo. 1943), in support of this proposition.  In *Hayden*, the defendants made several misrepresentations related to the sale of a hotel.  *Id.* at 212. The alleged misrepresentations related to the past gross receipts of the hotel, the operating expenses, the number of steady and regular roomers, the rates of rental paid by them, the age of the hotel and furniture, the seasonal volume of business at the hotel, the reputation and standing

of the hotel, and the past profits made by the operation.  *Id.* at 213.  The defendants contended

that the plaintiffs were not entitled to relief because they might have ascertained the truth with

respect to the matters in controversy by "ordinary care and attention in their examination and

inspection of the property before the sale was consummated and thus must be charged with

negligence for failing to do so."  *Id.*  The court rejected this argument because the defendants

controlled all of the evidence the plaintiffs would have needed in order to investigate and the

defendants encouraged the plaintiffs not to conduct an investigation.  *Id.* at 214.  The instant case

is not analogous.

      Here, on January 23, 2002, Defendant filed the arbitration award in the pending litigation

between Dominion and Defendant.  (Def.'s Br., Ex. A–14 [Docket Entry 37].)  In April 2002,

Defendant's attorney apprised Plaintiff's attorney of the arbitration award and the pending

litigation between Dominion and Defendant.  (*Id.*, Statement of Undisputed Material Facts ¶ 22,

Ex. A–11 [4/9/02 Electronic Mail Message From Dale Wallace to Reid Rutherford]; *admitted at*

Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 22.)  Defendant's attorney provided

Plaintiff's attorney the name of the case, style, and case number.  (*Id.*)  Thus, unlike the parties in

*Hayden*, not only did Defendant encourage Plaintiff to investigate, but Defendant provided

Plaintiff with the tools necessary to do so.

      Finally, Plaintiff contends that "[Defendant] dissuaded [Plaintiff] from pursuing an

investigation by telling [Plaintiff] that the Dominion agreement was confidential and that the court

case was under seal."  (Pl.'s Resp. at 42.)  As stated above, the Dominion/Defendant court case

was not under seal and the court in that case had already denied Defendant's motion to seal the

arbitration agreement.  (Def.'s Br., Ex. A–14 [Docket Sheet].)  Even assuming the

Dominion/Defendant agreement was "confidential," Plaintiff's argument that it needed that

agreement to assess the situation is disingenuous.  On April 9, 2002, Plaintiff's attorney told

Plaintiff that "the current issues seem to relate to the interpretation of the arbitration award," and

he would "secure all the public records."  (*Id.*, Statement of Undisputed Material Facts ¶ 22, Ex.

A–11 [4/9/02 Electronic Mail Message From Dale Wallace to Reid Rutherford]; *admitted at* Pl.'s

Resp., Resp. to Statement of Undisputed Facts ¶ 22.)  Thus, Plaintiff's attorney acknowledged

that Plaintiff did not need to view the actual agreement between the parties to understand the

situation.  For the foregoing reasons, each of Plaintiff's arguments with respect to its justifiable

reliance on Defendant's alleged misrepresentations fails as a matter of law.  Accordingly,

Defendant is entitled to summary judgment on Plaintiff's tort claims with respect to the 2003

Contract.

### b.    *Breach of Contract*

Plaintiff's fourth claim for relief is for breach of contract.  (Am. Compl. ¶¶ 65–70.)

Plaintiff alleges that "[Defendant] materially breached both the February 22, 2000 and January 8,

2003 Contracts by entering into the agreements with [Plaintiff] when it did not have the ability to

perform under the agreements because of its prior agreement with Dominion."  (*Id.* ¶ 68.)

Defendant contends that it is entitled to summary judgment on Plaintiff's breach of contract claim

with respect to the 2000 Contract because Defendant did not breach the contract and Plaintiff did

not suffer any damages.  (Def.'s 2d Br. at 11.)  Defendant contends that it is entitled to summary

judgment on Plaintiff's breach of contract claim with respect to the 2003 Contract because the

force majeure provision excuses Defendant's contract performance and warranties. (Def.'s Br. at 27–29.) I evaluate Plaintiff's breach of contract claim with respect to each contract below.

### *(1)    2000 Contract*

Defendant contends that it is entitled to summary judgment on Plaintiff's breach of contract claim with respect to the 2000 Contract because Defendant did not breach the 2000 Contract and Plaintiff cannot show any damages flowing from the alleged breach of the 2000 Contract. (Def.'s 2d Br. at 10.) Plaintiff asserts that Defendant is not entitled to summary judgment because "[a] party that enters into an agreement has a right to rely on the fact that the other party is legally able to perform what it agrees to perform. Performance rendered illegally, as done here, is not performance under the law." (Pl.'s 2d Resp. at 22.)

Under Colorado law, the elements for a breach of contract claim are: (1) existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendants; and (4) damages to plaintiff. *Western Distrib. Co. v. Diodosia*, 841 P.2d 1053, 1058 (Colo. 1992). The parties do not dispute that they entered into a binding contract on February 22, 2000. (Def.'s 2d Br., Statement of Undisputed Material Facts ¶ 11; *admitted at* Pl.'s 2d Resp., Resp. to Statement of Undisputed Material Facts ¶ 11.) Further, the parties do not dispute that Plaintiff performed under the 2000 Contract. The parties contest the third element — Defendant's performance.

Plaintiff contends that Defendant failed to perform under the 2000 Contract. (Pl.'s 2d Resp. at 23.) Defendant's obligation under the 2000 Contract was to "use commercially reasonable efforts to transmit the BTV programming during the term of th[e] [a]greement."

(Def.'s 2d Br., Ex. A–7 § 2.3 [2000 Contract].)  Plaintiff has not produced any evidence of

Defendant's failure to fulfil its obligations under the 2000 Contract.  In fact, Dallas and

Rutherford testified that they could not recall Defendant rejecting or refusing to broadcast any of

Plaintiff's programs from February 2000 through January 2003.  (Def.'s 2d Br., Statement of

Undisputed Material Facts ¶¶ 15–17; *admitted at* Pl.'s 2d Resp., Resp. to Statement of

Undisputed Material Facts ¶¶ 15–17.)  Thus, Plaintiff cannot show that Defendant breached the

2000 Contract.

Plaintiff contends, without citing any legal support, that "performance rendered illegally,

as done here, is not performance under the law."  (Pl.'s 2d Resp. at 22.)  Essentially, Plaintiff

asserts that Defendant breached the 2000 Contract because "[Defendant's] broadcasts of

[Plaintiff's] Christian programs were unlawful and in violation of [Defendant's] contract with

Dominion, and [Plaintiff] suffered significant harm . . ."  (Pl.'s 2d Resp. at 24.)  Plaintiff's

argument is nonsensical.  Irrespective of Plaintiff's view regarding the legality of 2000 Contract,

Defendant fully preformed under the contract.  Thus, even assuming Defendant did not have the

power to enter into such agreement with Plaintiff, Plaintiff still received the benefit of the bargain.

Moreover, at the time the parties entered into the 2000 Contract, Defendant's and

Dominion's rights were unclear under the Dominion/Defendant agreement.  Specifically,

Defendant believed its ability to broadcast Plaintiff's programs was an exception to Dominion's

exclusivity rights.  (Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 42.)  Nearly

two years after the parties entered into the 2000 Contract, an arbitration panel agreed with

Dominion's interpretation as to the exclusivity agreement.  (Def.'s Br., Ex. A–4 at 8 [12/1/01

Arbitration Award].)  Simply because an arbitration panel agreed with Dominion's interpretation of the arbitration agreement nearly two years after the parties entered into the 2000 Contract does not mean that Defendant lacked the rights and ability to enter into and perform the 2000 Contract. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for breach of contract with respect to the 2000 Contract.

### (2)   *2003 Contract*

Defendant argues that it is entitled to summary judgment with respect to Plaintiff's claim for breach of the 2003 Contract because "as a matter of law, [Defendant's] performance is excused by the contractual force majeure provision."  (Def.'s Br. at 27.)[4]  Specifically, Defendant contends that its inability to carry Plaintiff's programs "resulted from an adverse arbitration ruling in 2004, over a year after the 2003 [c]ontract was signed, in an arbitration initiated by Dominion." (*Id.* at 28.)  The force majeure provision in the 2003 Contract provides that:

> Acts of God or the public enemy, acts of any local, county, state, federal or other government in its sovereign or contractual capacity, fires, floods, adverse weather conditions (including but not limited to solar flares or sun outages with respect to satellite transmission interference), epidemics, quarantines, restrictions, sabotage, acts of terrorism, acts of third parties, strikes, freight embargoes, whole or partial satellite malfunctions, uplink failure, or any other event which is beyond the reasonable control of [Defendant] . . . shall constitute an excuse in performance of any obligation, condition or covenant of [Defendant] contained in this Agreement, any warranties or guarantees made herein, or any amendment thereto.

(*Id.*, Ex. A–20 § 3.5.1 [2003 Contract].)

---

[4]Defendant notes that the issue of breach of the 2003 Contract is not before the court on Defendant's motion for summary judgment.  Thus, I do not evaluate the elements of breach of contract as I did for the 2000 Contract.

Interpretation of a written contract is a question of law. *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996).  Absent an ambiguity, a court is constrained to determine the meaning intended by the parties under the contract from the four corners of the agreement. *In re Marriage of Crowder*, 77 P.3d 858, 861 (Colo. App. 2003).  "To determine whether an ambiguity exists, the language of the contract must be construed by application of the accepted meaning of the words and with reference to all of its provisions." *Id.*  An ambiguity will exist if the language of the contract is susceptible to more than one reasonable interpretation. *Id.*

The force majeure provision in the 2003 Contract is not ambiguous.  The provision insulates Defendant for liability flowing from an "event which is beyond the reasonable control" of Defendant.  (Def.'s Br., Ex. A–20 § 3.5.1 [2003 Contract].)  While Defendant did not know of the 2004 arbitration award in 2003, Defendant certainly knew of the interim arbitration ruling on December 12, 2001.  (Def.'s Br., Ex. A–4 at 8 [12/12/01 Arbitration Award].)  Thus, Defendant's willingness to proceed with the 2003 Contract cannot be considered an "event which is beyond the reasonable control" of Defendant.

Additionally, the generally accepted meaning of force majeure is "[a]n event that can be neither anticipated nor controlled.  The term includes both acts of nature (e.g., floods and hurricanes) and acts of people (e.g., riots, strikes, and wars)." *Blacks Law Dictionary* 657–58 (7th ed. 1999).  Courts generally interpret the words in a force majeure provision to relate to specific events like acts of god, terrorist attacks, inclement weather, union strikes, riots, and wars. *See Hoyl v. Babbitt*, 927 F. Supp. 1411, 1415 (D. Colo. 1996) (describing a force majeure as a strike or casualty); *see also One World Trade Center L.L.C. v. Cantor Fitzgerald Sec.*, 789

-36-

N.Y.S. 2d 652, 654 (N.Y. App. Div. 2004) (force majeure clause excused nonperformance due to terrorist attack).  Thus, Defendant's interpretation of the force majeure provision does not fit squarely within the generally accepted meaning of force majeure.

Defendant argues that this court should consider extrinsic evidence and take into consideration the fact that "[b]efore signing the 2003 [c]ontract, Plaintiff wanted to make sure it had an 'escape clause' 'to allow [Plaintiff] out of a situation where [Defendant] was not able to broadcast."  (Def.'s Br. at 20.)  In support, Plaintiff cites the deposition testimony of Rutherford.  (*Id.*, Statement of Undisputed Material Facts ¶ 43.)  As stated above, the contract is not ambiguous and I do not need to consider extrinsic evidence.  Even assuming I were to consider extrinsic evidence, Defendant's proffer of extrinsic evidence does not support its position.  Defendant only cites to a portion of Rutherford's deposition testimony.  (*Id.*)  Read in context, Rutherford describes that Plaintiff wanted the force majeure clause to cover situations where a satellite became inoperable or the technology became unreliable.  (*Id.*, Ex. A–8 at 145–46 [Dep. of Reid Rutherford].)  Accordingly, Defendant is not entitled to summary judgment on Plaintiff's breach of contract claim with respect to the 2003 Contract.

### 3.      *Limitation of Liability*

Defendant contends that "[e]ven if [Defendant's] contract performance is not excused by force majeure, and even if [P]laintiff proves a breach, [P]lantiff is not entitled as a matter of law to recover the damages it seeks."  (Def.'s Br. at 29.)  Specifically, Defendant contends that "[s]ection 3.4.1(a) limits the amount of recoverable damages available to [P]laintiff to $500,000 or the cumulative amount paid by [P]laintiff under the 2003 [C]ontract, whichever is less."  (*Id.* at

30.)  The section entitled "Liability and Indemnity" in the parties' 2003 Contract states in relevant

part:

> [Defendant] shall not be liable for any failure of performance of any production or post-production facility, microwave or uplink which is not solely within the control of [Defendant].  In addition, [Defendant] shall not be liable under any circumstances for: (I) libel, slander, infringement of copyright, invasion of privacy, disparagement or any other act or omission of [Plaintiff] arising from or in connection with the transmission or reception of any BTV content or communications by [Plaintiff] . . . or (ii) unlawful or unauthorized use of [Defendant's] facilities or services by [Plaintiff] or any agent, partner, employee or distributor.  In no event shall the aggregate amount of [Defendant's] liability exceed the less of $500,000 or the cumulative amount paid to [Defendant] by [Plaintiff] under this Agreement.

(Pl.'s Resp., Ex. 13 § 3.4.1 [2003 Contract].)  "The meaning and effect of a contract is to be

determined from an examination of the entire instrument, not merely from isolated clauses or

phrases."  *In re Estate of Haywood*, 599 P.2d 976, 978 (Colo. App. 1979).  Here, read in its

entirely, it is clear that the limitation of liability clause applies to Plaintiff's breach of contract

claim.  The provision contemplates three situations where under no circumstances will Defendant

be liable and concludes that in "no event," which means any other event, shall Defendant's liability

exceed "the less of $500,000 or the cumulative amount paid to [Defendant] by [Plaintiff] under

this Agreement."  (*See* Pl.'s Resp., Ex. 13 § 3.4.1(a) [2003 Contract].)

Plaintiff's response to Defendant's argument regarding the limitation of liability clause

focuses on the proposition that such clauses are inoperable with respect to claims for negligent

and intentional misrepresentation.  (*Id.* at 62–72.)  Plaintiff's tort claims are no longer before this

court.  Thus, I do not need to discuss Plaintiff's arguments with respect to this issue.  Moreover,

Plaintiff and Defendant are sophisticated companies, represented by legal counsel in an arms

-38-

length transaction.  Plaintiff cannot now be heard to complain regarding the terms of the contract it negotiated.  Accordingly, any damages Plaintiff may recover for breach of the 2003 Contract will be limited in accordance with section 3.4.1(a) of the 2003 Contract.

### 4.    *Conclusions*

Based on the foregoing it is therefore ORDERED that:

1.    Defendant's motion for summary judgment (# 36) is GRANTED in part and DENIED in part.  Defendant's motion is GRANTED with respect to Plaintiff's three tort claims and Defendant's request for a limitation of damages.  Defendant's motion is DENIED with respect to Plaintiff's breach of contract claim based on the 2003 Contract.

2.    Plaintiff's motion for summary judgment on its reckless or intentional misrepresentation claim (# 39) is DENIED.

3.    Defendant's second motion for summary judgment based on the parties' 2000 Contract (# 57) is GRANTED.

4.    The court will hold a Final Pretrial Conference commencing at 2:15 o'clock p.m. on Thursday, March 30, 2006, in Courtroom A1001 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado.  In preparing for and participating in the conference, the parties and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site, specifically http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord_ins.pdf and (2) utilize the specific template located at http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord.wpd  These specific web addresses should be used to insure that the proper format is observed.

Dated this 17th day of March, 2006.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge